# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Dr. Paul C. Clark, Sr., et al., | * | |
| Plaintiffs | * | |
| v. | * | Civil Case No. 8:20-cv-1325-LKG |
| Council of Unit Owners of the 100 | * | |
| Harborview Drive Condominium | | |
| Association, | * | |
| Defendant. | * | |

## MEMORANDUM OPINION AND ORDER

This is a case concerning alleged retaliation against the owners of a condominium unit in response to their exercise of rights under the Fair Housing Act. Pending before the Court is Plaintiffs' Motion for Reconsideration of the Court's Oral Ruling on January 26, 2024 regarding the scope of the search of Defendant's Board Members' personal email accounts. ECF No. 68. Although Plaintiffs term their Motion as one for reconsideration, it is more properly characterized as a motion for further relief in light of the results of Defendant's search of the Harborview and Barkan servers for particular emails. Additionally, although not a primary focus of the Motion, there remain outstanding disputes regarding the sufficiency of Defendant's privilege log and whether the documents Defendant has submitted for *in-camera* review are subject to the attorney-client privilege and/or are work product. For the reasons discussed below, Plaintiffs' Motion is granted, in part, and denied, in part.

## BACKGROUND

This case is the latest round in a long-running dispute between Dr. Paul C. Clark,[1] the owner of a condominium unit in a building located at 100 Harborview Drive in Baltimore, Maryland, and the Council of Unit Owners of the 100 Harborview Drive Condominium – the condominium association responsible for the building.  ECF No. 1, at 3-4.  In the most recent round of litigation preceding this case, the United States Bankruptcy Court for the U.S. District of Maryland ordered Defendant to, among other things, repair the unit and pay damages of approximately $750,000.  *Id.* at 4-5.

Importantly for the purposes of this case, Plaintiffs allege three specific retaliatory acts. First, Plaintiffs allege that Defendant removed their personal possessions from the unit, not as a means of securing the space to repair the unit, but to deprive Plaintiffs of their possessions in retaliation for their previous efforts to seek relief regarding the condition of the unit.  *Id.* at 5. Specifically, Plaintiffs allege that the removal of the items occurred after the Bankruptcy Court found that the unit had already been remediated.  *Id.*  Second, Plaintiffs allege that Defendant charged them administrative fees not allowed under the Condominium's By-Laws.  *Id.* at 6. Finally, Plaintiffs allege that Defendant published a Litigation Update for all Condominium residents stating that Plaintiffs had failed to pay the required assessments.  ECF No. 17, at 7-8. Plaintiffs initial Complaint alleged that the first two actions constituted impermissible retaliation in response to Plaintiffs' previous exercise of their rights under the Fair Housing Act ("FHA"). ECF No. 1, at 4-5.  Plaintiffs' subsequent Amended Complaint added the third allegation, as well. ECF No. 17-1, at 8.

---

[1] The other Plaintiffs are Dr. Clark's wife, Rebecca Delorme, and their minor son.  ECF No. 1, at 3.

Since that initial filing, the case has been vigorously litigated by both sides, including during the most recent discovery disputes before this Court.   In response to an Amended Complaint, Defendant moved to dismiss the case for failing to state a plausible claim under the FHA.  ECF No. 12-1.  The Honorable Paul W. Grimm ultimately denied the Motion in response to Plaintiffs' request to file a Second Amended Complaint.[2]  ECF No. 16.  Thereafter, the case was reassigned to the Honorable Lydia Kay Griggsby for all further proceedings and the undersigned for discovery.  ECF No. 32.

On July 13, 2023, the Court held a discovery conference regarding Plaintiffs' then-pending Motion to Compel.  ECF No. 40.  The crux of the dispute concerned Defendant's failure to produce any electronic mail communications related to the allegations in Plaintiffs' Second Amended Complaint.  ECF No. 36, at 3-4 ("After reviewing these documents painstakingly, it was learned that not a single responsive communication was provided in response to Plaintiffs' Request for Production among other items").  Defendant did not object to the production of electronic mail, as a matter of principle, but Plaintiffs' request as worded – asking for all email communication from October 1, 2017 to the present – was overly broad and burdensome.  ECF No. 37, at 10.  Both parties' positions had some merit.  That is, Defendant's failure to produce any email was untenable, but the scope of the documents requested was plainly overbroad.  Accordingly, during the hearing on the discovery dispute, the Court ordered Defendant to conduct three electronic mail searches for the terms: 1) "Clark(s)" and "assessments"; 2) "Clark(s)" and "Litigation Update"; and 3) "Clark(s)" and "remediation."  While the searches were not intended to elicit the only emails that would have to be produced, they were intended to serve as a starting point.  If they revealed a

---

[2] As Defendant has asserted in the present discovery dispute, Defendant asked the Court to dismiss the present case as being at odds with the previous rulings of the Bankruptcy Court.  ECF No. 18, at 2-3.  The Court ultimately allowed the case to proceed despite these arguments.

significant degree of information, then further searches may not have been required.  Conversely, if they produced limited information, other search terms may have been appropriate.  Importantly, for the purposes of the present dispute, the Court ordered Defendant to search Harborview's server, as well as the server of its management company, Barkan Management.  Finally, the Court provided the parties specific direction as to the time within which such searches were to be done and the results produced:

> Within 30 days, Defendant shall conduct the search for communications as directed by the Court, produce all emails identified or provide Plaintiffs information regarding the number of emails identified per the search terms, and if necessary, the parties shall meet regarding any further narrowing of the search terms, custodians, or time frame.

ECF No. 40.  According to Defendant, however, upon the conclusion of the hearing, Plaintiffs increased their demand to include other terms which the Court had not ordered.  ECF No. 43, at 2. The parties ultimately agreed to a list of twenty-two separate searches that Defendant would conduct and produce responses to.  *Id.* at 3-4.  The negotiations over the terms, however, took up approximately half of the time allotted for the production of emails.  *Id.* at 3.  Accordingly, Defendant requested an additional month to complete its production.  *Id.* at 4.

Additionally, relevant to the present dispute, Plaintiffs requested that Defendant search the private email account of Dr. Janan Broadbent, the former President of the Council's Board.  *Id.* at 3.  According to Defendant, such a search was not needed given Dr. Broadbent's testimony that she did not use her private email for her work as Board President.  *Id.  See also*  ECF No. 43-1, at 3 ("I hereby confirm that I did not send or receive emails on my personal email account relating to activities of the Board.").  However, as Plaintiffs later responded, Dr. Broadbent had failed to conduct a review of her private email inbox to determine whether there might be any relevant communications therein.  ECF No. 45, at 2.  Plaintiffs also highlighted that Dr. Broadbent's private

4

email may have communications from her time working as Vice President of the Board.  *Id*. at 3.
In response to both the dispute over the production of email from Dr. Broadbent's private email
account and Defendant's failure to produce any electronic mail within the time frame originally
ordered, the Court set a status conference on August 31, 2023.  ECF No. 46.

On the eve of the Conference, Defendant filed an additional Status Report including
information regarding the number of hits the searches produced from the Harborview and Barkan
servers and again asserting that at no point – while she was serving as President or Vice President
– did Dr. Broadbent conduct any business related to the Board using her private email account.
ECF No. 47, at 2-3.  During the conference on August 31, 2023, the Court further refined the terms
to limit the number of emails that the searches produced.  ECF No. 50, at 2.  At the conclusion of
the conference, the Court requested a Status Report within thirty days regarding progress on the
production of emails.  ECF No. 49.  On October 2, 2023, Defendant provided an additional Status
Report stating that it expected that it would produce the responsive emails by the end of October.
ECF No. 50, at 8.  Seemingly frustrated by the delay in the production of the emails, Plaintiffs, in
turn, asked the Court, among other things, to issue an Order finding Defendant in default.  ECF
No. 51, at 4-5.  In light of the parties' difficulty in reaching agreement on search terms and the
cost of production, the Court denied this request.  Although the Court denied the request for
sanctions, it ordered Defendant to produce all responsive emails by November 1, 2023.  ECF No.
52.

Although there was hope that this might have begun to resolve the matter, on November 1,
2023, the parties filed dueling Status Reports each accusing the other of bad faith, again asking the
Court to impose sanctions on the other and raising various other issues regarding the sufficiency
of Defendant's production.  ECF Nos. 53, 54.  Accordingly, after additional briefing from both

parties, the Court set a third discovery hearing for January 26, 2024.  ECF No. 61.  Several issues were discussed during the hearing, including the sufficiency of Defendant's privilege log, whether certain emails that Defendant identified as privileged were in fact such, and whether Defendant was obligated to search the private emails of their past and present Board Members for communications relevant to this case.  As a means of resolving the first and second issues, the Court agreed to review several emails and attachments which Defendant subsequently provided for *in-camera* review.  ECF No. 65, at 2.

In arguing for a search of the private emails of Defendant's Board Members, Plaintiffs primarily relied on emails dating between May 2019 and January 2021 found on Harborview's servers from John Cochran, a former President of the Board from 2010 to 2014, to members of the Board at their private email addresses, including Dr. Broadbent, regarding the Plaintiffs and their litigation.  ECF No. 59-1; ECF No. 37, at 26.  Although Defendant acknowledged the existence of these emails, it explained away their significance by emphasizing that there was no evidence that any Board Member ever responded to the emails.[3]  ECF No. 67, at 62.  In support, Defendant presented the testimony of the current President of the Board, Donna Senft, who testified, among other things, that: 1) she did receive emails related to her work on the Board in her personal email, but when she did, she would forward them to her official Board President email account, *id.* at 61; 2) although she read Mr. Cochran's emails, most Board members would immediately delete them, and regardless neither she nor other Board members would respond to them, *id.*; 3) beginning in 2019, a board email account was created on the Harborview server, which individuals could email

---

[3] Plaintiffs noted that Ashley Connor responded to one of Mr. Cochran's emails, ECF No. 67, at 56, but overlook that she was written at her Harborview email address and responded from that email.  ECF No. 59-1, at 36.  There remains an open question whether any Board Member responded to Mr. Cochran or conducted any other Board related business from a private email address.

to communicate with Board members and which would then disburse emails to the private email accounts of some Board members, *id.* at 67-68.

Plaintiffs' counsel, in response, characterized Mr. Cochran differently:

> Mr. Cochran is the former president of the community association, and he still holds a tremendous amount of sway. He did a one year in what's called the global HOA. So, they have this community, and there's a global homeowners association. And the sort of – kind of you want to think of it as two separate – there's the towers and there's pier side. So, two separate community associations that are affiliated with it. He's very involved in this process . . . ."

*Id.* at 52. Additionally, Plaintiffs argued that because Board Members would have responded only to Mr. Cochran, it would be unlikely that any of these responses would be found on any of the servers that the Court had ordered Defendant to search. *Id.* Finally, given the fact that Dr. Broadbent previously testified that she did not have any emails in her private email relating to the litigation, Plaintiffs questioned whether Defendant's present assertions regarding Mr. Cochran and his relationship to the Board could be verified. *Id.* at 53.

In response to the parties' dueling assertions regarding the role of Mr. Cochran and whether the private emails of any Board members would have communications relevant to the case, the Court outlined three potential solutions. First, the Court could accept Defendant's assertions regarding the limited role that Mr. Cochran played in the management of the property after he completed his term as President and deny any request for searches of Board Members' private email addresses. *Id.* at 55. Second, the Court could accept Plaintiffs' assertions regarding the role that Mr. Cochran played in Board affairs and the likelihood that individual Board Members responded to him from their private email addresses. *Id.* at 57. Finally, third, the Court could order Defendant to conduct a search of its present Board Members' private emails for any responses to Mr. Cochran from 2019-21 regarding the Clarks. *Id.* at 56. If there were no responses,

this would confirm Defendant's assertions regarding the limited role that Mr. Cochran played in Board affairs during the time period most relevant to this case.  Conversely, if the search elicited any responses, it would substantiate Plaintiffs' concerns and perhaps open the door for additional searches along the lines of those conducted of the Harborview and Barkan servers.  Given the limited scope of the search, this would limit to the maximum extent possible any burden on Defendant, while respecting the legitimate concerns raised by Plaintiffs' presentation of emails to Board Members at their private emails regarding the Clarks and their litigation.  Given the limited burden from such a search, the Court concluded that this would be the appropriate way to resolve the dispute given the legitimate concerns Plaintiffs had raised based on the specific email communications they had had presented.  *Id.* at 73 ("[M]y ruling more or less remains the same, which is, you know, do a search of these personal email accounts for any emails sent to John Cochran relating to the Clarks.").

Despite the Court's ruling, both parties continued to press their respective positions.  First, Plaintiffs argued that the Court should issue subpoenas requiring searches of the private emails of Board Members akin to those conducted of the Harborview and Barkan servers.  *Id.* at 74.  The Court rejected this approach, explaining that sufficient cause had not yet to be shown for this type of wide ranging search of Board Members' private emails.  *Id.* at 75.  Meanwhile, Defendant sought clarification as to precisely which email accounts needed to be searched and for which emails.  *Id.*  In response, the Court again clarified that Defendant's Board Members would be required to search for any email responses to Mr. Cochran regarding the Clarks and/or Ms. Delorme.  *Id.* at 76.  Defendant confirmed its understanding of the Court's Order.  *Id.* at 77.  The Court then went on to address a separate dispute between the parties.  Nonetheless, towards the end of the hearing, Defendant again sought clarification as to whether it was required to search the

personal emails of their Board Members.  *Id.* at 90.  The court was definitive in its response that it did.  *Id.*  Defendant, however, asserted that it had no ability to search the private emails of its Board Members.  *Id.*  Accepting Defendant's representation, the Court deferred ruling on whether this claim was in fact true, asking Defendant to first run a search of any email accounts over which it admitted having control to see if it uncovered any responses to emails from Mr. Cochran regarding the Clarks.  *Id.* at 92 (The Court: "Why don't you run the search and get back to me. I don't need to reach this issue yet.").

On February 9, 2024, Defendant filed a Status Report stating that its search of the Harborview and Barkan servers had uncovered no responsive communications.  ECF No. 69, at 2. On the same day, Plaintiffs filed a "Motion for Reconsideration" asking the Court to order a search of the private emails of all Board Members akin to those previously ordered for the Harborview and Barkan servers and to order Defendant to produce a more complete privilege log.  ECF No. 68.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 37(a) "authorizes the basic motion for enforcing discovery obligations."[4] 8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2285 (3d ed. 2023).  When a party fails to answer a request for production of documents or an interrogatory, the Rule allows the opposing party to move for an order compelling an answer.  Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv).  The moving party must certify in the motion that it has conferred, or attempted to confer, in good faith with opposing counsel in an effort to obtain the desired

---

[4] Although Plaintiffs term their Motion a "Motion for Reconsideration", the Court understands the proper posture differently.  In response to Defendant's assertion that it lacked the ability to search the private emails of its Board Members, the Court ordered Defendant to conduct a search of the Harborview and Barkan servers, while reserving ruling on whether further searches were necessary after Defendant conducted its initial search.

material without court involvement.  Fed. R. Civ. P. 37(a)(1).  District courts enjoy "substantial

discretion in managing discovery," including granting or denying motions to compel.  *Lone Star*

*Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995).

**ANALYSIS**

As noted above, three issues remaining outstanding: 1) whether Plaintiffs are entitled to a

search of email communications in Board Members' private email and the scope of the search; 2)

whether the emails Defendant has submitted for *in-camera* review are protected by the attorney-

client privilege or are work product; and 3) whether the Court should order Defendant to prepare

a more complete privilege log.[5]  As discussed below, the second and third issues are closely

related.

### I.      Search of Board Members' Private Emails

Given the failure of Defendant's search of the Harborview and Barkan servers to uncover

any communications responsive to Mr. Cochran from Defendant's Board Members, the Court must

determine whether a search of their private emails is appropriate.  As explained during the January

2024 discovery hearing, a limited search of the private emails for any communications responding

to John Cochran from 2019-21 regarding the Clarks or Ms. Delorme appropriately balances the

need for further discovery while limiting the burden on Defendant.  Defendant, at the end of the

hearing and in their Opposition, oppose this request on the grounds that it does not have custody

or control over the private emails of its Board Members.  *See* ECF No. 70, at 3.  As Plaintiffs

highlight and as discussed below, this position is incorrect.

---

[5] Plaintiffs recently filed an additional Motion to Compel regarding Monique Almy's emails, but that Motion is not yet fully briefed.  *See* ECF No. 72.

It is well-established that "that a company's officer or agent should not be able to avoid the rules of discovery by using personal email, which is in the custody and control of that officer or agent, for work purposes." *See Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, No. 3:12-CV-1058-SI, 2018 WL 6305665, at *3 (D. Or. Dec. 3, 2018).  In fact, "[t]he use by parties of private email accounts for business purposes does not lower the threshold for reasonable inquiries, and, if anything, increases it." *Bulldog Erectors, Inc. v. Flatiron Constructors, Inc.*, No. 2:22-CV-0008-M, 2023 WL 10890991, at *4 (E.D.N.C. Sept. 13, 2023).

"To have possession, custody, or control does not require actual possession, custody, or control." *Amaraut v. Sprint/United Mgmt. Co.*, No. 3:19-cv-411-WQH-AHG, 2020 WL 1433281, at *5 (S.D. Cal. Mar. 23, 2020) (emphasis omitted).  *See also Soto v. City of Concord*, 162 F.R.D. 603, 619–20 (N.D. Cal. 1995); *TetraVue, Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 14cv2021-W-BLM, 2017 WL 1008788, at *2 (S.D. Cal. Mar. 15, 2017).  "Property is deemed within a party's possession, custody, or control if the party has . . . the legal right to obtain the property on demand." *Stone v. Vasquez*, No. 05cv1377-JAT, 2009 WL 2581338, at *1–*2 (E.D. Cal. Aug. 20, 2009) (quoting *Thomas v. Hickman*, No. 06cv215-AWI-SMS, 2007 WL 4302974, at *13–*14 (E.D. Cal. 2007)).  *See United States v. Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("Control is defined as the legal right to obtain documents upon demand"); *Goolsby v. Cnty. of San Diego*, No. 17cv564-WQH-NLS, 2019 WL 3891128, at *4 (S.D. Cal. Aug. 19, 2019) (same).  For example, "[a] party may be ordered to produce a document in the possession of a non-party entity if that party has a legal right to obtain the document or has control over the entity who is in possession of the document." *TetraVue, Inc.*, 2017 WL 1008788, at *2 (quoting *Soto*, 162 F.R.D. at 619).  "The fact that Defendant may have to expend time and energy to retrieve the documents does not make the documents inaccessible or outside of Defendant's control."

*Nutrition Distrib. LLC v. PEP Rsch., LLC*, No. 16cv2328-WQH-BLM, 2018 WL 1245052, at *6 (S.D. Cal. Mar. 9, 2018). A party "is under an affirmative duty to seek that information reasonably available to [it] from [its] employees, agents, or others subject to [its] control." *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal. 2006) (alterations in original) (quoting *Gray v. Faulkner*, 148 F.R.D. 220, 223 (N.D. Ind. 1992)).

The majority of circuits have explicitly rejected a definition of "control" that focuses exclusively "on the party's practical ability to obtain the requested documents." *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2015 WL 8482256, at *3 (N.D. Cal. Dec. 10, 2015).

> Rule 34 'control' would not require a party to have legal ownership or actual physical possession of any documents at issue. Instead, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 515 (D. Md. 2009) (internal citations omitted). Documents are not discoverable under Rule 34 if the party that holds them "could legally – and without breaching any contract – continue to refuse to turn over such documents . . . ." *Driscoll's, Inc. v. Cal. Berry Cultivars, LLC*, No. 2:19-cv-00493-TLN-CKD, 2022 WL 3348019, *3 (E.D. Cal. Aug. 12, 2022). "The party seeking production of the documents . . . bears the burden of proving that the opposing party has such control." *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1452.

To determine whether documents belonging to a non-party are in the possession, custody, or control of a party, courts examine the degree of authority the responding party possesses over the non-party. *Inventiv Health Consulting, Inc. v. French*, No. 5:18-CV-295-D, 2020 WL 728148, at *4 (E.D.N.C. Feb. 12, 2020). As part of this analysis, the Court may consider whether Plaintiffs'

proffered example documents show that Board Members were conducting official Board business on personal accounts, using personal accounts for professional work, or otherwise communicating about Board affairs on personal accounts. *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2020 WL 13561760, at *3 (N.D. Ga. Apr. 1, 2020).

While Defendant correctly asserts that it is not its responsibility to personally review the emails in its Board Members' private inboxes, it is not absolved of all responsibility to attempt to obtain the emails. Defendant, at a minimum, has an obligation to ask its current Board Members for emails that may be relevant to the case, as the Court ordered. *See, e.g.*, *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394-AJN-BCM, 2016 WL 5408171, at *7 (S.D.N.Y. Sept. 27, 2016) ("a number of courts in this District and elsewhere apply the most 'practical' test of all: whether the party has asked the non-party to turn over the documents at issue and, if so, whether the non-party is willing to do so. Because this question is so crucial (and perhaps because its answer is typically known only to the party from which discovery is sought), courts insist that corporations, at the very least, ask their former employees to cooperate before asserting that they have no control over documents in the former employees' possession.") (internal quotation marks omitted); *Union Home Mortg. Corp. v. Jenkins*, No. 1:20-cv-2690, 2021 WL 1110440, at *9–10 (N.D. Ohio Mar. 23, 2021) (directing employer to ask current employees to search for and provide for production of all relevant emails and text messages in their personal email and cell phone accounts that are responsive and, if no documents exist, to certify as much in writing); *Goolsby*, 2019 WL 3891128, at * 4 (finding lack of control where plaintiff offered only speculation that personal devices were used by the deputies and noting that, regardless, the county had already asked employees to search for and produce relevant information); *ID Ventures, LLC v. Chubb Custom Ins. Co.*, No. 17-12182, 2018 WL 8807125, at * 2 (E.D. Mich. Oct. 12, 2018) (requiring

plaintiff to ask relevant employees to search their personal email accounts for responsive documents and to provide defendant with an affidavit from each employee attesting that a search was made and all relevant documents were provided to plaintiff's counsel); *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 449 (S.D.N.Y. 2011) (where former employee "would have turned over any responsive e-mails from her Gmail account to [her former employer, attorney Donziger] had he asked for them," those emails were within Donziger's "control" for discovery purposes, despite "being located in her private e-mail account rather than on his law firm's server"); *Bank of Mong. v. M&P Glob. Fin. Servs., Inc.*, No. 08-60623, 2009 WL 10682131, at *7 (S.D. Fla. Dec. 22, 2009) (directing defendants to "make all reasonable efforts to obtain responsive documents from any officer or individual employed by" defendants from personal computers); *Uniden Am. Corp. v. Ericsson Inc.*, 181 F.R.D. 302, 307-08 (M.D.N.C. 1998) ("there is no indication that defendant Ericsson has even made a request for these documents from [non-party affiliate] Ericsson Mobile"); *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 423 (N.D. Ill. 1977) ("At the very least, defendants should make inquiry of such former employees. This is especially true where, as here, defendants do not assert that the former employees are unwilling or unable to cooperate."); *Grace Bros. Ltd. v. Siena Holdings, Inc.*, No. 184-CC, 2009 WL 1547821, at *1 (Del. Ch. June 2, 2009) (granting motion to compel defendant Siena to produce emails "between members of Siena's board of directors" where Siena "failed to even ask that the directors look for any relevant emails in their accounts"). This is particularly the case here where multiple Board Members have been actively involved in the litigation of the case, including Dr. Senft who voluntarily appeared and offered testimony regarding Board Members' email practices. *See Royal Park Invs.*, 2016 WL 5408171, at *9 (ordering party to produce Board Members' private emails where "[e]ach director,

in short, has a significant past history of cooperating with document requests[.]" (internal citations omitted)).

Several courts have rejected Defendant's position that it has no control over the private email accounts of its Board Members even if they may have been using them to discuss Board-related matters. As one court has stated, "[s]uch an approach would gut Rule 34 and make it way too easy for high-level executives to hide evidence." *TradeShift, Inc. v. BuyerQuest, Inc.*, No. 20-cv-01294-RS, 2021 WL 1586283, at *2 (N.D. Cal. Apr. 23, 2021). *See also Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-939-WHA, 2017 WL 2972806, at *2 (N.D. Cal. July 12, 2017) ("Otto Trucking must produce responsive documents in the custody, control or possession of its officers, namely, Mr. Ron, Ms. Morgan or Mr. Bentley. It cannot hide responsive documents simply because these officers' work for Otto Trucking was done using their personal email accounts, especially since they are all current Otto Trucking officers."); *Env't World Watch, Inc. v. The Walt Disney Co.*, No. CV 09-4045-DMG, 2011 WL 13124125, at *3 (C.D. Cal. Nov. 3, 2011) ("Responsive documents stored in that computer and other computers he used for EWW business would appear to be within EWW's possession, custody or control, through Mr. Becvar [sole officer and director]. Further, any personal email accounts used by Mr. Becvar for EWW business are also subject to search."); *Miniace v. Pac. Mar. Ass'n*, No. C 04-03506 SI, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006) ("Numerous courts have found that corporations have control over their officers and employees and that corporations may be required to produce documents in their possession."). Further, as several courts have explained, these officers likely would be required to respond to such a request from Defendant. "Numerous courts have found that corporations have control over their officers and employees and that corporations may be required to produce documents in their possession." *Miniace*, 2006 WL 335389, at *2. *See also Herbst v. Able*, 63

F.R.D. 135, 138 (S.D.N.Y. 1972) (ordering the corporate defendant to obtain copies of SEC transcripts of its non-defendant employees, finding that the corporate employees were persons within the corporation's control); *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 558-559 (S.D.N.Y. 1994) (ordering the corporate party to produce tapes made by a corporate officer in furtherance of his role as an officer in the possession of his attorney).

As the Court explained in its January hearing on the present dispute, Plaintiffs have shown sufficient cause for the limited search of the private emails of current Board Members for any emails from 2019-21, responding to John Cochran regarding the Clarks or Ms. Delorme. Although Dr. Broadbent previously represented to the Court in an affidavit that she had no emails regarding the Clarks in her personal email, subsequent discovery revealed that, at a minimum, she had received emails from Mr. Cochran regarding the litigation. That said, as the Court emphasized, it was possible that Mr. Cochran's emails were mass mailings which Board Members routinely ignored. Plaintiffs' assertions regarding the role of Mr. Cochran and the use of private email to conduct Board business were based, to a degree, on speculation, and thus presently do not justify the broad searches previously conducted of the Harborview and Barkan servers. *See Shackleford v. Vivint Solar Dev., LLC*, No. ELH-19-954, 2020 WL 6273892, at *5 (D. Md. Oct. 26, 2020) (refusing to order the search of personal employee's emails where any benefit would be outweighed by the burden on the producing party: "Not only would this be a potential invasion of privacy to which the employees might lodge an objection or seek a protective order, but it would be expensive and time-consuming. And it is unclear whether it would yield any benefit to plaintiff."). Nonetheless, the combination of the emails, which were directed to the private accounts of several Board Members, and the inconsistency with Dr. Broadbent's prior representation provide cause for a limited search. *See Ultravision Techs., LLC v. Govision, LLC*,

No. 2:18-cv-00100-JRG-RSP, 2020 WL 10692709, at *2 (E.D. Tex. Aug. 28, 2020) (ordering Defendant to produce emails from the personal account of a current employee that requesting party showed was used for official business).  If any of the current Board Members refuse to provide any responsive emails to Plaintiffs, the Court will consider Plaintiffs' request for a third-party subpoena for such information.  *See Sabre Indus., Inc. v. Waller*, No. 18-2111, 2021 WL 9957668, at *5 (C.D. Ill. Dec. 22, 2021) ("If either Turner's personal email address or Skyline's business records are not within Waller or APS's possession, custody, or control, the Court will entertain a motion for leave to issue a third-party subpoena for documents").

Within thirty days, Defendants shall file a Status Report with the number of emails found responsive to the search ordered.  The Court's ruling is limited to current Board Members; it does not apply to individuals who may have received emails from Mr. Cochran but are no longer on the Board.  *Miniace*, 2006 WL 335389, at *2 ("The Court however, denies the motion [requesting the contents of private emails] with regards to the former directors."); *Greater N.Y. Taxi Ass'n v. City of New York*, No. 13 civ. 3089-JCF, 2017 WL 4012051, at *3 (S.D.N.Y. Sept. 11, 2017) ("none of the GNYTA Custodians is currently a board member, so whatever mechanisms of control GNYTA had over them have since disappeared").  It also does not apply to individuals who are currently members of the Board but were not members of the Board between 2019 and 2021.

## II.     In-Camera Review and Privilege Log

Additionally, the parties dispute whether several of the documents listed in Defendant's privilege log are, in fact, privileged.  As part of this dispute, Plaintiffs additionally argue that Defendant has failed to provide a complete privilege log, which would allow Plaintiffs to determine whether Defendant has properly asserted the privilege regarding each of the documents. *See* ECF No. 68, at 12.  As a means of resolving these disputes efficiently and limiting the burden

on both parties, the Court agreed to undertake an *in-camera* review of several documents to determine if Defendant properly asserted the privilege and whether additions to the privilege log were required.

For the court to determine whether a party properly asserted the attorney-client privilege regarding a particular document, the court must determine:

> (1) [T]he asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 265 (D. Md. 2008) (quoting *In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997)).  "Sometimes the document itself makes this clear, such as when the lawyer writes to the client to provide an opinion and the correspondence reflects that it is a confidential communication."  *Id.*  However, it is often "impossible to determine if the privilege applies without extrinsic evidence, which must be provided by affidavit, deposition transcript, or other source."  *Id.*  In addition to the attorney-client privilege, "[t]he work product doctrine protects from disclosure documents 'prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative.'"  *Black & Decker Corp. v. United States*, 219 F.R.D. 87, 91 (D. Md. 2003) (quoting Fed. R. Civ. P. 26(b)(3)).

Although it is beyond the scope of this Opinion to describe, in detail, the over 300 pages of documents provided for *in-camera* review, Defendant has provided an insufficient basis for the Court to conclude that several documents are either protected by the privilege or are work product. These include: 1) correspondence, dating from 2013-14, from an engineer to the Board regarding

the condition of the Clarks' unit and what would be required to repair it, PRIV_HV-10-31-2023 132-3; 2) correspondence with the Clarks, dating from 2012, relating to the sufficiency of efforts to remediate the unit, PRIV_HV-10-31-2023 134-2; 3) photos and diagrams of the unit, PRIV_HV-10-31-2023 132-6, PRIV_HV-10-31-2023 132-23; 4) communication from 2012 between the Condominium's General Manager and the Clarks regarding access to the unit, PRIV_HV-10-31-2023 134-8; 5) communications from 2010 between Mr. Cochran and the Condominium's General Manager regarding prior efforts to respond to the Clarks' concerns and what action would be taken in the future, PRIV_HV-10-31-2023 136-5; 6) a document Mr. Cochran composed in 2013 recounting his recollection of the dispute with the Clarks regarding the unit, PRIV_HV-10-31-2023 140-26; 7) communications between the President of the Board and the members of the Board regarding a separate lawsuit the Board was facing, PRIV_HV-10-31-2023 140-54; 8) a summary of an inspection of the Clarks' unit from 2012, PRIV_HV-10-31-2023 140-66; 9) court filings from 2017 seeking emergency access to the unit for the purpose of an inspection, PRIV_HV-10-31-2023 142; 10) ledgers recounting the charges associated with the Clarks' unit, PRIV_HV-10-31-2023 2199; 11) a Board resolution regarding the collection of assessments, PRIV_HV-10-31-2023 2203; 12) a document notifying the Clarks of a hearing date on their alleged unpaid assessments, PRIV_HV-10-31-2023 2208; 13) communication with Plaintiffs' counsel regarding the unpaid assessments, PRIV_HV-10-31-2023 2248; and 14) communications between Barkan's employees expressing their opinion of the Clarks' present lawsuit and the Clarks more generally, PRIV_HV-10-31-2023 3343, 3450.  While many of the documents are only of limited relevance to the present case and raise serious questions as to

whether Plaintiffs are properly tailoring their requests for documents, Defendant has failed to establish that the privilege applies to these documents.[6]

Conversely, several of the documents included are, on their face, privileged.  In many cases the documents above are attached to brief one or two-line communications between counsel and the Board regarding the present litigation or previous rounds of litigation.  PRIV_HV-10-31-2023 133-1, PRIV_HV-10-31-2023 3432.  The production also includes drafts of memoranda providing legal updates, including edits from counsel, to be provided to the Board regarding the status of the various lawsuits involving the Condominium Association, PRIV_HV-10-31-2023 3427_3, and memoranda composed for counsel from Mr. Cochran regarding the impact of litigation on Defendant, PRIV_HV-10-31-2023 140-32.  Finally, included in the production are a limited number of communications between the Board conveying advice from counsel.  PRIV_HV-10-31-2023 2197.  The Court agrees that all of these documents are either privileged or are work product and thus are exempt from disclosure.

Within thirty days, Defendant shall produce the documents, and those like them, which the Court has identified as unprotected.  Once Defendant has produced any documents the Court identified as not privileged, and Plaintiffs have reviewed such documents, if any disputes remain over whether any other documents are, in fact, privileged, the parties shall meet and confer to discuss which of the categories highlighted above the documents align most closely with.  The parties shall use the guidance above to resolve any remaining disputes as to whether documents identified in the privilege log are, in fact, privileged or work product.  If the parties cannot reach agreement, they may return to the Court for further guidance.  However, to the extent that the Court

---

[6] Further, some of the documents, such as those concerning assessments on the Clarks' unit, are directly relevant to the case.

determines that any party does not have a substantial basis for their position in light of the Court's guidance, the Court reserves the right to impose sanctions, including, but not limited to any costs and fees the opposing party incurred in preparing for and attending any court proceedings related to such disputes.  Given the Court's guidance above regarding the legitimacy of Defendant's assertions of privilege, the Court refrains from requiring Defendant to add additional detail to the privilege log.  Any time that would be devoted to such is more appropriately spent complying with the Court's directives above and meeting and conferring with opposing counsel regarding any documents that are not explicitly discussed herein.

## CONCLUSION

For the aforementioned reasons, Plaintiffs' Motion for Reconsideration is granted, in part, and denied, in part.

So ordered.

Date:   May 13, 2024                                    _____/s/_____
                                                        Ajmel A. Quereshi
                                                        U.S. Magistrate Judge